Cheryl A. MURRELL, Plaintiff,

v.

USF & G INSURANCE, and Netmax[1] Claims Services, Inc., wholly owned subsidiaries of St. Paul Insurance Co., Defendants.

No. 98 C 6758.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 31, 2000.

1. Because this name is spelled both with and without a "t" ("Netmax" and "Nemax") throughout the pleadings, the Court will use "Netmax" for purposes of consistency.

L. Steven Platt, Arnold & Kadjan, Chicago, IL, plaintiff.

Robert E. Arroyo, Jackson, Lewis, Schnitzler & Krupman, Chicago, IL, for defendant.

### MEMORANDUM OPINION AND ORDER

KEYS, United States Magistrate Judge.

This matter comes before the Court on Defendants' Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, Defendants' Motion for Summary Judgment is denied.

### FACTS

Defendant United States Fidelity and Guaranty Company ("USF & G") is an Illinois Corporation. (Complaint [Compl.] ¶ 5.) Defendant Netmax Claims Services, Inc. ("Netmax") is a wholly owned subsidiary of USF & G. (Compl. at 1.) Both USF & G and Netmax are wholly owned subsidiaries of St. Paul Insurance Co. (Compl. at 1.) On June 22, 1992, USF & G and Netmax hired Plaintiff Cheryl Murrell as an investigator in USF & G's Special Investigations Division ("SID"). (Plaintiff's 12(N)[2] [Pl.'s 12(N)] ¶ 1; Equal Employment Opportunity Commission Complaint [EEOC Compl.] ¶ 3; Defendants' 12(M) [Defs.' 12(M)] ¶ 1.) For the purposes of this Opinion, the terms USF & G and Netmax will be used interchangeably in referring to the Defendants.

On March 7, 1997, Russ Kesler, Ms. Murrell's supervisor, sent a memorandum to his supervisor, Charles Nelson, asking for "authority to terminate Cheryl Murrell effectively [sic] immediately."[3] (Pl.'s 12(N) ¶ 2 at 15; Plaintiff's Exhibit [Pl.'s Ex.] 11 at 4.) Kathleen McCutcheon, USF & G's Home Office Human Resource Manager, also received a copy of this memorandum. (Pl.'s Ex. 11 at 1.)[4] During this week, Mr. Kesler also called Ms. Murrell to tell her that he was coming to Chicago "to discuss problems with the Chicago branch." (Pl.'s 12(N) ¶ 32; EEOC Compl. ¶¶ 40–41; Defs.' 12(M) ¶ 32.) His call upset Ms. Murrell. Id.

On March 18, 1997, Ms. Murrell met with Mr. Kesler and Ms. McCutcheon. (Pl.'s 12(N) ¶ 2 at 3; EEOC Compl. ¶ 43.) During that meeting, Ms. Murrell was advised that she would be placed on a Performance Improvement Plan ("P.I.P."). Id. When Ms. Murrell reviewed the document on which they were basing the decision to place her on a P.I.P., she commented that "the details cited [were] incorrect and unfounded." Id. Mr. Kesler and Ms. McCutcheon stated that "it would be very difficult [for Ms. Murrell] to make the necessary improvements in order to pass the P.I.P." Id. According to Ms. Murrell, "Ms.

---

**2.** Ms. Murrell has not fully and strictly complied with the particular requirements of Local Rule 12(N). However, since her lengthy, rambling document is not entirely defective, the Court will make an allowance, wherever possible (despite the inconvenience and drain on the Court's time in so doing).

Ms. Murrell and her attorney should consider themselves warned—in the future, they will not find this Court so agreeable or accommodating towards similar shortcomings. In the future, when putting pen to paper, they should be mindful that, as the Seventh Circuit has colorfully stated, "[j]udges are not like pigs, hunting for truffles buried in briefs."

*United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991).

**3.** Charles Nelson is also Head of the SID. (EEOC Compl. ¶ 37.)

**4.** Ms. Murrell has referred to statements made by Ms. McCutcheon regarding this memorandum of March 7th. (Pl.'s 12(N) ¶ 2.) However, the Court cannot consider this evidence, since Ms. Murrell failed to include Ms. McCutcheon's depositional testimony as evidence of these statements. Plaintiff's Exhibit 12, which Ms. Murrell refers to, is Mr. Kesler's deposition, not Ms. McCutcheon's deposition. (Pl.'s Ex. 12.)

McClutcheon [*sic*] made it clear that she was aware of [her] emotional state as a result of the harassment inflicted by the company over the previous 16 months and suggested that [she] find another type of work to do." (Pl.'s 12(N) ¶ 2; EEOC Compl. ¶ 43.) Also, Ms. Murrell claims that she advised Ms. McCutcheon that "it was not the job that caused her depression, but the managerial staff," and Ms. McCutcheon "suggested very strongly that this company was not the proper company for [her] to work for and suggested strongly that [she] resign and take a few months off to try and recover." (Pl.'s 12(N) ¶ 2; EEOC Compl. ¶ 43.)

Ms. Murrell did not feel that the P.I.P. being offered was "one that would be fair or workable." (Pl.'s 12(N) ¶ 3; EEOC Compl. ¶ 44.) Mr. Kesler and Ms. McCutcheon made it clear that the only alternative that Ms. Murrell had was to resign. (Pl.'s 12(N) ¶ 3; EEOC Compl. ¶ 44.) In her opinion, the company made it clear to her that she "was not welcome back as an employee under any circumstances." (Pl.'s 12(N) ¶ 3; EEOC Compl. ¶ 48.)

Mr. Kesler advised Ms. Murrell that, "due to the comments she had made" to Mr. Kesler, they were willing to make her an "offer on a severance package."[5] (Pl.'s 12(N) ¶ 2 at 16; Pl.'s Ex. 10 at 27–28.) Mr. Kesler claims that they explained the severance package to Ms. Murrell at that meeting. *Id.*

Ms. Murrell requested some time "to think over [her] options as [she] was very upset and had a career breaking decision to make." (Pl.'s 12(N) ¶ 3; EEOC Compl. ¶ 44.) Mr. Kesler and Ms. McCutcheon gave Ms. Murrell two days to make her decision. (Pl.'s 12(N) ¶ 3; EEOC Compl. ¶ 44.) Ms. Murrell requested more than two days, so that she would have time to discuss the matter with her attorney. *Id.* However, Ms. McCutcheon refused to give her more time. *Id.* By the end of the meeting on March 18th, Ms. Murrell had not given an answer as to which way she would go. (Pl.'s 12(N) ¶ 2; Pl.'s Ex. 10 at 32.)

Incidentally, USF & G alleges that Ms. Murrell left the office on March 18, 1997, and did not come back, except for a brief time on March 28, 1997, to turn in her company car and company-issued equipment to Mr. Kesler. (Defs.' 12(M) ¶ 6; Appendix in Supp. of Defs.' Motion Sum. J. ["Defs.' Ex."], Ex. B, Cheryl Murrell's Deposition [Murrell Dep.] at 50–51.) According to USF & G, Ms. Murrell did not perform any of her job duties after March 18, 1997. (Defs.' 12(M) ¶ 6.) On the other hand, Ms. Murrell claims that she continued to work out of her house until March 28, 1997, by responding to pages, responding to voice mail, working on a company-provided lap to computer, driving the company-provided car, and working on company files. (Pl.'s 12(N) ¶¶ 2, 6; Pl.'s Ex. 14 ¶¶ 9–10.) She said that the last day that she performed work for USF & G was "[s]ometime in March of 1997."[6] (Murrell Dep. at 50.) Ms. Murrell explained that she and others from the Chicago SID unit did not come into the office on a regular basis, because there was not sufficient space for all of the employees to work in the office. (Pl.'s 12(N) ¶ 6; Pl.'s Ex. 14 ¶¶ 3–8.) Instead, the investigators would report in approximately once a week. *Id.*

---

**5.** It appears to the Court that this severance package was tied to Ms. Murrell's possible resignation. Therefore, Ms. Murrell had two options: participate in a P.I.P. or resign.

**6.** In her Affidavit, Ms. Murrell claims that she continued to check her voice mail and respond to it until mid-April of 1997, when Defendants changed her voice mail and access code. (Pl.'s 12(N) ¶¶ 2, 6; Pl.'s Ex. 14 ¶ 11.) This conflicts with what was said during her deposition. As the Seventh Circuit held, in *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 532 (7th Cir.1999), "when a conflict arises between a plaintiff's own sworn deposition and his sworn affidavit, the deposition testimony overrides statements made in the affidavit." Thus, this Court will disregard paragraph 11 of Ms. Murrell's Affidavit.

Ms. Murrell was unable to reach her attorney in the two days allotted to her by Mr. Kesler and Ms. McCutcheon for her decision, because the attorney was out of town. (Pl.'s 12(N) ¶ 4; EEOC Compl. ¶ 45.) On March 20, 1997, Ms. Murrell called Mr. Kesler and advised him of her decision to resign. *Id.* According to Ms. Murrell, she confirmed with him that by resigning, she "would still have a period of three weeks to make [her] final decision." (Pl.'s 12(N) ¶ 4; EEOC Compl. ¶ 45.) Ms. Murrell believed that she was protected by the Older Workers Benefit Protection Act of 1990, 29 U.S.C. § 626(f), because she was over 40. (Pl.'s 12(N) ¶ 4.)

Also on March 20th, Mr. Kesler sent Ms. Murrell a "Severance Agreement and General Release" in memorandum form. (Defs.' 12(M) ¶ 4; Defs.' Ex. C 1 at 1.) The "Severance Agreement and General Release" set forth the terms for "an amicable separation of [Ms.] Murrell's employment by USF & G." *Id.* The document stated that USF & G records would reflect that Ms. Murrell's employment with USF & G would "terminate effective June 27, 1997." (Defs.' Ex. C 1 at 1.) According to this document, Ms. Murrell would continue her

> present assignment until March 28, 1997 ... [when she would] no longer ... be required to perform that assignment, but ... [would] be fully available to work with USF & G on such matters as shall be required from time to time. Of course, during this period, [Ms. Murrell] must abide by all standard policies and procedures of USF & G including, but not limited to, USF & G's Code of Conduct.

(Defs.' Ex. C 1 at 1.) The "Severance Agreement and General Release" asserted that, if Ms. Murrell complied with all terms of the "agreement," USF & G would provide her with a series of benefits, including accrued vacation pay, health and dental insurance, and a possible VIP Bonus. (Defs.' Ex. 1 at 1.) In return, she had to release USF & G from any and all liabilities or claims. (Defs.' Ex. C 1 at 3.) Neither Ms. Murrell nor Mr. Kesler signed this "Severance Agreement and General Release." (Defs.' Ex. C 1 at 4.)

On March 21, 1997, Mr. Kesler e-mailed Ms. Murrell regarding the "Severance Agreement and General Release." (Pl.'s Ex. 2.) [7] Mr. Kesler stated that it was his "understanding that you accept the offer this date. I also understand that you accept the offer pending discussion with your attorney maintaining your rights as outlined in paragraph 7." (Pl.'s Ex. 2.) Furthermore, Mr. Kesler told Ms. Murrell that he planned to meet with her in Chicago on Friday, March 28, 1997, "to retrieve all equipment and items in [her] possession." [8] (Pl.'s Ex. 2.)

On March 27, 1997, Mr. Kesler e-mailed Ms. McCutcheon and Mr. Nelson stating that:

> I did page and speak with Cheryl after our conversation. I advised Cheryl that I was still coming to Chicago tomorrow, 03/27/97, to collect her equipment as per our agreement which she verbally accepted last Friday 03/21/97. She stated she would confer with her attorney who had been the one asking for the extention [*sic*]. I advised her that we had been proceeding under the agreement and she had not been at work since accepting the agreement. Again, she stated she would consult with her attorney.
>
> It should be noted as I have already stated that at no time since our meeting with her in Chicago has she asked for or been granted any time off. She has not taken any sick days or any other autho-

---

7. Although this "offer" is not mentioned in the 12(M) or 12(N) Statements, it is part of the record, as one of Plaintiff's exhibits.

8. According to Ms. Murrell, she requested an extension for the retrieval of the equipment, but Mr. Kesler refused it. (EEOC Compl. ¶ 46.)

rized days however, she has not been performing any functions of her job. (Pl.'s Ex. 3; Pl.'s 12(N) ¶ 4.)

On March 28, 1997, Mr. Kesler collected all of Ms. Murrell's company equipment. (Pl.'s 12(N) ¶ 5; Pl.'s Ex. 14 ¶ 10; EEOC Compl. ¶ 46.) According to Ms. Murrell, this was the event that "convinced" her that she was "terminated"—when "they took away [her] car, [her] computer, [her] fax machine, [her] pager, [her] ID card, [her] security pass to get into the office and any other equipment that [she] needed to work." (Murrell Dep. at 50.) USF & G continued to deduct from Ms. Murrell's paycheck for the use of a company car at least through April 4, 1997, even though she did not have the car as of March 28, 1997. (Pl.'s 12(N) ¶ 2; Defs.' Ex. C 3 at 1.)

On March 30, 1997, Mr. Kesler e-mailed Ms. McCutcheon and said: "Kathleen: I forgot to mention in my other email [sic] that I have held onto Cheryl [sic] bonus package. Once she has signed the agreement and the 7 days have passed I will give it to her." (Pl.'s Ex. 5; Pl.'s 12(N) ¶ 4.) On April 8, 1997, Mr. Kesler e-mailed Ms. McCutcheon again and acknowledged that the "21–day period" under the Older Workers Benefit Protection Act expired on April 12, 1997: "Kathleen: Just to let you know I have not yet received the signed copy of the agreement from Cheryl. If I calculate correctly her 21 days expires Friday the 12th. Have you heard anything?" (Pl.'s 12(N) ¶ 4; Pl.'s Ex. 13.)

From April to December of 1997, Michael Greenwald, Ms. Murrell's attorney, and Reid Bowman, USF & G's in-house counsel, sent letters to each other and carried out a series of discussions regarding Ms. Murrell's employment situation. First, on April 11, 1997, Mr. Greenwald sent Mr. Kesler a letter informing him that Ms. Murrell had consulted his law firm concerning "the offer you have tendered in connection with the termination of her employment." (Pl.'s 12(N) ¶ 10; Defs.' Ex. C 2 at 1.) Ms. Murrell authorized Mr. Greenwald "to reject the offer on her be-

half." *Id.* Mr. Greenwald also told Mr. Kesler that "the conduct of various past and present employees of NE[T] MAX/ USF & G gives Ms. Murrell valid and substantial claims against the company for gender discrimination in employment, sexual harassment, and intentional infliction of emotional distress...." (Defs.' Ex. C 2 at 1.) Furthermore, Ms. Murrell had asked him "to prepare the proper pleadings to be filed with the Equal Employment Opportunity Commission and/or the Illinois Department of Human Rights as well as with the United States District Court...." (Defs.' Ex. C 2 at 1.) In his letter, Mr. Greenwald also stated that Ms. Murrell would be willing to settle for "reasonable severance pay ... reimbursement for past expenses, vacation pay ... continuation of benefits ... compensatory damages ... provisions for appropriate outplacement services ... and reasonable attorneys' fees." (Defs.' Ex. C 2 at 2; Defs.' 12(M) ¶ 10.)

On April 14, 1997, Ms. Murrell sent a follow-up letter to Mr. Kesler stating that she was "willing to work if allowed." (Pl.'s 12(N) ¶ 11; Defs.' Ex. C 3 at 1.) She said that she was unable to work, because she had been "denied access to the necessary equipment to do [her] job." (Defs.' Ex. C 3 at 1.) Ms. Murrell further stated that she was:

unclear as to the present status of [her] employment. If I have been terminated, you have an obligation to comply with C.O.B.R.A. I would ask that you send the necessary information to me immediately so that I can file the necessary paperwork and pursue and protect my rights under C.O.B.R.A.

(Pl.'s 12(N) ¶¶ 2, 11; Defs.' Ex. C 3 at 2.)

On May 4, 1997, Mr. Kesler sent Mr. Nelson and Ms. McCutcheon an e-mail that stated:

Per our conversation on Friday I have revised and updated the original performance improvement plan that was completed on Cheri. I have attached both

for you [*sic*] review and input. I have indicated in the revised plan that the original date of the plan will be March 19, 1997. This is because she was advised that date by Kathleen and myself that if she rejected the offer and agreement she would be placed on a [*sic*] improvement plan immediately.

(Pl.'s 12(N) ¶ 2 at 9; Pl.'s Ex. 15.)

On May 7, 1997, Mr. Bowman sent a letter to Mr. Greenwald stating that, "[f]ollowing up on our discussion several days ago and this morning, and my voice mail to you yesterday, USF & G would like Ms. Murrell to return to work" no later than May 8th, the next day. (Defs.' 12(M) ¶ 12; Defs.' Ex. C 4 at 1.) Ms. Murrell claims that the offer to return to work was not acceptable. (Pl.'s 12(N) ¶ 12.) Also on May 7th, through Mr. Greenwald, Ms. Murrell refused USF & G's offer to return to work, unless several conditions were met, including no P.I.P., the expungement of her personnel record, reassignment, other accommodations, and no waiver or release requirement. (Defs.' 12(M) ¶ 13; Defs.' Ex. C 5 at 1.) Mr. Greenwald also wrote that "[i]n anticipation that you may not be in a position to negotiate any reasonable context for Ms. Murrell's reinstatement, I request that you provide me with a copy of your employment ADR policy along with a copy of any document indicating Ms. Murrell's assent to binding arbitration in the event of an employment dispute." (Defs.' Ex. C 5 at 2.)

On May 19, 1997, Mr. Bowman wrote a letter to Mr. Greenwald stating: [9]

[W]e still have heard nothing from you [since our discussion on May 13th], and Ms. Murrell has not returned to work. As you know, USF & G has continued to pay Ms. Murrell her full salary and benefits, even though she has not worked since March 18, 1997. Initially, USF & G continued to pay Ms. Murrell in reliance on Ms. Murrell's agreement to take a severance package, and since she thereafter rescinded that initial agreement, we have nevertheless continued to pay her in a good faith effort to work with you and get her back to work. Two months have now passed, and we now no longer can continue to pay her for not performing any work. Accordingly, and as I indicated in my voice mail message to you last Friday, effective today, she will not be paid unless and until she returns to work.

(Defs.' Ex. C 5A at 3.)

Also on May 19, 1997, Mr. Greenwald responded to Mr. Bowman by letter and reiterated Ms. Murrell's conditions for going back to work. (Defs.' Ex. C 6 at 2–3.) Mr. Greenwald stated that:

On March 28, Kesler ousted Ms. Murrell from her job, taking her car, office equipment and files. This action was taken approximately two weeks prior to the expiration of the company's ultimatum that Ms. Murrell either take a PIP

---

9. Amazingly, Ms. Murrell objects that this entry of Defendants' violates Local Rule 12(M). That objection is overruled. *See, supra,* n. 1.

Ms. Murrell also objects to the contents of this letter, alleging that the cited material: 1) contains inadmissible hearsay under Federal Rule of Evidence 802; and 2) was written in furtherance of settlement discussions. (Pl.'s 12(N) ¶ 14.) Defendants claim that the letter: 1) establishes Mr. Bowman's understanding of Ms. Murrell's status of employment and her demands; and 2) is not being offered for the truth of the matter asserted. (Defs.' Supp. 12(M) ¶ 14.) Furthermore, Defendants believe that Ms. Murrell's objection, that this letter was written in furtherance of settlement discussions, is "disingenuous."

The Court will allow the introduction of this evidence on the basis that the statements are not being offered to prove the truth of the matter asserted under Federal Rule of Evidence 801(c). Moreover, the Court notes that this document is a "[r]ecord[ ] of regularly conducted activity" under Federal Rule of Evidence 803(6), and therefore would fall under that hearsay exception. Finally, the Court finds no evidence to show that these statements were made in furtherance of a settlement negotiation, or that this letter, even if, *arguendo,* made in furtherance of a settlement would be inadmissible under Federal Rule of Evidence 408.

of [*sic*] accept an inadequate severance package. Thereafter, Ms. Murrell wrote to Kesler telling him that she was ready, willing and able to continue her career and I wrote to reject the company's offer.

(Defs.' Ex. C 6 at 3–4.) Mr. Greenwald also stated that Mr. Bowman had asked him for a "dollar settlement amount," and that Mr. Greenwald believed that USF & G had "attempted to take advantage of Ms. Murrell's interest in working out a settlement of all her claims on mutually acceptable terms by gratuitously 'assuming' she would come back to work immediately under the same onerous conditions that obtained [*sic*] when Kesler removed her." (Defs.' 12(M) ¶ 15; Defs.' Ex. C 6 at 4.) Mr. Greenwald also said that Mr. Bowman's 'offer' would "put Ms. Murrell in precisely the same position she was in nine weeks ago, when Kesler gave her his ultimatum." (Defs.' Ex. C 6 at 4.)

On May 22, 1997, Mr. Bowman wrote to Mr. Greenwald "identifying certain inaccuracies that Bowman perceived in Greenwald's correspondence."[10] (Defs.' 12(M) ¶ 16; Defs.' Ex. C 7.) Mr. Bowman stated that on March 18, 1997, Ms. Murrell "was given time to consider her options, but was asked to continue working until she had done so. Nevertheless, Ms. Murrell did not continue working." (Defs.' Ex. C 7 at 3.) In that letter, Mr. Bowman also stated that: "USF & G remains willing to have Ms. Murrell return to work, but we cannot keep this option open indefinitely.... If, however, Ms. Murrell does not want to come back, USF & G is willing to discuss a *reasonable* severance package." (Defs.' Ex. C 7 at 6.)

On June 22, 1997, Ms. Murrell was given an award for her five years of service at USF & G. (Pl.'s 12(N) ¶ 2; Pl.'s Ex. 6.) Also, USF & G continued to pay Ms. Murrell's salary through June 27, 1997. (Pl.'s 12(N) ¶ 9; Defs.' 12(M) ¶ 9.) According to USF & G, "[a]lthough [Ms.] Murrell was not performing any job duties," they paid her "to ensure the retirement benefits that formed partial consideration for the severance agreement." (Defs.' 12(M) ¶ 9; Bowman's Dep. at 40–42.)

On August 5, 1997, Mr. Bowman wrote to Mr. Greenwald stating that he was "look[ing] forward to continuing our discussions...." (Pl.'s 12(N) ¶ 2; Pl.'s Ex. 7 at 1.) Mr. Bowman sent a copy of USF & G's ADR policy along with this letter. *Id.*

On December 3, 1997, Ms. Murrell "received a termination of [her] health benefits from USF & G."[11] (Pl.'s 12(N) ¶ 2; Murrell Dep. at 54.)

On December 16, 1997, Mr. Greenwald sent a letter to Mr. Bowman asking him to "advise forthwith concerning your client's position about whether Cheryl Murrell's employment has been terminated." (Defs.' Ex. C 9 at 2.) Mr. Greenwald wrote that "[i]f your position is that her employment has been terminated, please advise me of the date your client claims it notified her of the termination." (Defs.' Ex. C 9 at 2; Pl.'s 12(N) ¶¶ 2, 17; Defs.' 12(M) ¶¶ 17.)

On December 19, 1997, Mr. Bowman sent a response letter to Mr. Greenwald, recounting the events in the past ten months and stating that, "USF & G views Ms. Murrell to have quit and/or abandoned her job effective March 18, 1997, but given the payments made to Ms. Murrell, USF & G's records reflect that USF & G implemented Ms. Murrell's resignation/job abandonment on June 30, 1997."[12] (Pl.'s

10. Ms. Murrell objects to the contents of this letter on the same basis as her objections to the May 19, 1997 letter: Likewise, the Court overrules Ms. Murrell's objections for the same reasons stated before. *See, supra,* n. 9.

11. Ms. Murrell claims that USF & G sent her a "Termination of Employment" notice by certified mail and cites to this notice as Pl.'s

Ex. I. (Pl.'s 12(N) ¶ 2 at 11.) However, there is no Pl.'s Ex. I in the record and, therefore, no evidence of such a notice.

12. Ms. Murrell again objects to the contents of this letter on the same basis as the two earlier objections. Similarly, the Court over-

12(N) ¶ 2; Defs.' 12(M) ¶ 18; Defs.' Ex. C 10 at 1.)

On December 23, 1997, Ms. Murrell was sent a document from C.O.B.R.A., stating that her former employers, USF & G and Netmax had notified C.O.B.R.A. of a qualifying event, her termination of employment effective December 3, 1997. (EEOC Compl. ¶ 1; Pl.'s Ex. 8.)

On January 19, 1998, Ms. Murrell signed a charge with the EEOC claiming that USF & G and Netmax had terminated her "after a long history of gender-based discrimination and Harrassment [*sic*]." (Pl.'s 12(N) ¶ 2; Compl. Ex. A at 4; Defs.' Ex. A 1 at 4.) In her complaint to the EEOC, Ms. Murrell describes the comments and actions of numerous USF & G employees, that allegedly constitute sexual discrimination and sexual harassment. (EEOC Compl. ¶¶ 1–48.) That charge was filed by Ms. Murrell's on January 22, 1997. (Pl.'s 12(N) ¶ 2, 7; Defendants' 12(M) [Defs.' 12(M) ] ¶ 7.) On·August 13, 1998, the EEOC finished processing Ms. Murrell's charge and gave her a "Notice of Right to Sue." (Compl.¶ 16(d); Compl. Ex. A at 1.)

On October 27, 1998, within 90 days of receiving her "Notice of Right to Sue," Ms. Murrell filed a Complaint against USF & G and Netmax, in District Court, alleging two counts under Title VII of the Civil Rights Act of 1964. (Compl.¶¶ 4, 5, 16(d); Compl. Ex. A.) On the first count—Ms. Murrell claims that she suffered "severe emotional distress" and "pecuniary losses" due to USF & G's sexual harassment of her. (Compl.¶¶ 17–21.) Relatedly, Ms. Murrell also pleads, in a second count of retaliation, that the discriminatory actions of USF & G employees against her were in response to her making a complaint of sexual harassment and sexual discrimination and that they constituted a "continua-

tion of the discriminatory practices" she endured while working at USF & G. (Compl. ¶¶ 22–26; EEOC Compl. ¶ 47.)

USF & G and Netmax now move for summary judgment, alleging that no genuine issue of material fact exists as to whether Ms. Murrell's charges are time-barred, because she filed her EEOC Complaint more than 300 days after the last [13] act of alleged discrimination. (Memorandum in Support of Defendants' Rule 56 Summary Judgment Motion [Defs.' Mem.] at 1.) According to USF & G and Netmax, the date of the last allegedly discriminatory act—or the "accrual date" for Ms. Murrell's claims—is March 18, 1997, when "defendants advised [Ms.] Murrell that she could either resign or be placed on a Performance Improvement Plan ("PIP")." (Defs.' Mem. at 3, 6.) USF & G and Netmax claim that the EEOC charge was untimely filed, because it was filed on January 22, 1998, more than 300 days after March 18, 1997. Ms. Murrell asserts that her charge of discrimination was timely filed with the EEOC, within 300 days of March 28, 1997 (and March 28, 1997 is exactly 300 days before January 22, 1998). (Complaint ¶ 16b; Memorandum in Opposition to Defendants' Rule 56 Summary Judgment Motion [Pl.'s Mem. Opp.]·at 2.) Ms. Murrell believes that "there is evidence upon which a jury could decide that the plaintiff filed her charge within 300 days of the last act of discrimination, after all inferences are drawn in plaintiff's favor." (Mem. Opp. at 7.)

## DISCUSSION

### I. Standard for Summary Judgment

Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The initial burden is

---

rules Ms. Murrell's objections for the same reasons given before. *See, supra,* nn. 9–10.

**13.** The allegations of earlier sexual harassment and discrimination, from Count I of the

Complaint, appear to be linked by Ms. Murrell's claim of an ongoing, or "continuing" violation. (See Pl.'s Mem. Opp. at 10–11; EEOC Compl. ¶ 47.)

on the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting FED. R. CIV. P. 56(c)). If the moving party meets that burden, the burden shifts to the non-moving party to show, through specific facts in the record, that there is "a genuine issue for trial." *Celotex*, 477 U.S. at 322–26, 330, 106 S.Ct. 2548; *see also Rush v. McDonald's Corp.*, 966 F.2d 1104, 1109 (7th Cir.1992) (non-moving party then has the burden of providing specific facts to show a genuine issue "open for trial").

Courts will grant summary judgment when the non-moving party, who has the burden of proof at trial, fails to make a sufficient showing on an essential element of her case. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. On the other hand, summary judgment is denied if there are "disputes over facts that might affect the outcome of the suit...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, disputes over facts that are "irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. 2505. The governing substantive law establishes which facts are material. *Id.* at 248, 106 S.Ct. 2505.

To raise a genuine issue of material fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Moreover, "mere conclusory allegations" are not enough. *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1002 (7th Cir.1998). "[A]n adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but

the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The non-moving party must present evidence from the record showing that a "genuine issue for trial" exists, such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–249, 106 S.Ct. 2505.

Usually, the court must construe all facts in the light most favorable to the non-moving party, and may not weigh credibility questions. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. However, pursuant to Northern District of Illinois Local Rule 12(N), failing to contest the moving party's Rule 12(M) statements "is considered a binding admission of those facts." *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1313 (7th Cir.1995). Rule 12(N)(3)(a) requires the non-moving party to support disputed facts with "specific references to the affidavits, parts of the record, and other supporting materials relied upon...." N.D. ILL. LOCAL RULE 12(N)(3)(a). The Seventh Circuit has clearly articulated that courts need not "scour the record" in search of evidence supporting the 12(N) claims. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir.1994). Therefore, all material facts set forth by the moving party "will be deemed to be admitted unless controverted by the statement" of the non-moving party. LOCAL RULE 12(N)(3)(b).

## II. Standard for Requirement to File Within 300 Days of Date of Discriminatory Act

■ To preserve a claim of employment discrimination in Illinois, a plaintiff must file a charge of discrimination with the EEOC within 300 days from the date of the alleged discriminatory act.[14] 42 U.S.C.

---

**14.** Under Title VII of the Civil Rights Act of 1964, Illinois is a "deferral" state, so plaintiffs have 300 days to file a charge, instead of the usual 180 days. 42 U.S.C. § 2000e–5(e); *Lever v. Northwestern Univ.*, 979 F.2d 552, 553

(7th Cir.1992); *Hentosh v. Herman M. Finch Univ. of Health Sciences*, 167 F.3d 1170, 1173–74 (7th Cir.1999). According to Title VII, "state fair employment practices agencies have primary jurisdiction over employ-

§ 2000e–5(e); *Gilardi v. Schroeder,* 833 F.2d 1226, 1230 (7th Cir.1987); *see also Koelsch v. Beltone Elecs. Corp.,* 46 F.3d 705, 707 (7th Cir.1995). If a discrimination charge is not filed within this 300–day period, the action is time-barred. *Speer v. Rand McNally & Co.,* 123 F.3d 658, 662 (7th Cir.1997). The Seventh Circuit has established that "[w]hen the discriminatory act occurs, no less than whether a given act was discriminatory, is a question of fact." *Lever,* 979 F.2d at 553.

The accrual date of a plaintiff's claim is the date on which the statute of limitations begins to run. *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 450 (7th Cir.1990). In cases of alleged discriminatory termination of employment, the period begins to run on the date the employee is notified unambiguously that her employment will be terminated. *Ricks,* 449 U.S. at 257–58, 101 S.Ct. 498 (holding that the accrual date was "at the time the tenure decision was made and communicated to [the professor]"). "Time starts to run with 'the *discriminatory act,* not the point at which the *consequences* of the act become painful.'" *Lever,* 979 F.2d at 553 (quoting *Chardon v. Fernandez,* 454 U.S. 6, 8, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981)). Additionally, "[a]n employer's refusal to undo a discriminatory decision is not a fresh act of discrimination." *Id.* at 556.

## III. Analysis

### A. Requirement to File Within 300 Days of Effective Termination Date

There exists a genuine issue of material fact as to whether Ms. Murrell's claims were filed within 300 days of the last act of alleged discrimination. Ms. Murrell and USF & G agree that Ms. Murrell filed the EEOC Charge on January 22, 1998, but disagree as to the accrual date of her claims. USF & G claims that the date of accrual is March 18, 1997, when Ms. Murrell met with Mr. Kesler and Ms. McCutcheon to discuss the P.I.P. plan and the possibility of a severance agreement. (Defs.' Mem. at 3, 6.) Ms. Murrell claims that the accrual date is on (or after) March 28, 1997, when Mr. Kesler "took away" her company car, computer, fax machine, pager, ID card, security pass, and all other office equipment. (Pl.'s Mem. Opp. at 2; Murrell Dep. at 50.)

While March 18, 1997, was the last day that Ms. Murrell went into her office to work (except for her brief visit there to return work equipment ten days later), there are facts that demonstrate that a reasonable jury could find that Ms. Murrell was not unambiguously notified of her termination until March 28, 1997, or later.

First, Ms. Murrell alleges that she continued to work out of her home until March 28, 1997, by responding to pages, responding to voice mail, working on her company lap top, driving the company car, and working on company files. Second, USF & G continued to deduct the use of the company car from Ms. Murrell's paycheck through April 4, 1997, even though she did not have the car. Third, Mr. Bowman sent a letter to Mr. Greenwald, saying that "USF & G would like Ms. Murrell to return to work" no later than May 8, 1997. Fourth, on June 22, 1997, Ms. Murrell was given a five-year service award for her work at USF & G up until that date. Since her first day of work was June 22, 1992, this award indicates that she was employed by USF & G until June 22, 1997. Fifth, USF & G continued to pay Ms. Murrell's salary through June 27, 1997. Finally, USF & G did not terminate

ment discrimination complaints." 42 U.S.C. § 2000e–5(c); *Delaware State College v. Ricks,* 449 U.S. 250, 254, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980). Therefore, in the present case, the EEOC first referred Ms. Murrell's charge to the appropriate Illinois agency, the Illinois Department on Human Rights ("IDHR"). (Compl.¶ 16(c).) The IDHR eventually waived its jurisdiction, and the EEOC processed Ms. Murrell's claim through its agency. (Compl.¶ 16(c).)

Ms. Murrell's health benefits until December 3, 1997.

Furthermore, unlike in *Lever* and *Mull*, a genuine issue of material fact exists in this case as to whether Ms. Murrell was unambiguously notified of her termination of employment by March 18, 1997.

In *Lever*, the Seventh Circuit was presented with the issue of when the accrual date of the plaintiff/assistant professor's claim against the university occurred: on May 5th, when the dean sent a letter to the professor stating that he would recommend to the provost that tenure be denied, or nine months later, on February 12, when the provost issued his final approval to the decision denying tenure. 979 F.2d at 554. The *Lever* Court upheld the district court's finding that the professor was unambiguously notified of her termination when the dean sent her the letter. *Id.* at 557.

Here, in contrast to *Lever*, there are no precise dates on which Ms. Murrell was unequivocally notified of her definite, eventual termination. A reasonable jury could find that, until December of 1997, Ms. Murrell had the option of going back to work or resigning.

In *Mull*, the Seventh Circuit held that no genuine issue of material fact existed as to whether the plaintiff was notified of his termination at a May 2nd meeting with his supervisor. *Mull*, 784 F.2d at 290. The supervisor first met with the plaintiff two weeks earlier—on April 18th—to tell him that he would be removed as business manager on May 14th. *Id.* at 285. At that first meeting, the plaintiff was informed that he could either take a new permanent position as coordinator in Philadelphia, or he would be immediately terminated, with the option of retiring early. *Id.* at 285. The two met again on May 2nd, and the supervisor told the plaintiff that his removal as manager was not open for reconsideration. *Id.* at 285. At that time, since he did not want to go to Philadelphia, the plaintiff was offered a temporary assignment, to last until his termination date (set for December 31st). *Id.* He did not formally reject the Philadelphia job until June 28th, and he continued to work at the office on "special assignment" after that date. *Id.* at 286. He received written notice about his termination on December 6th, by letter stating that he would be terminated on December 31st. *Id.* The Seventh Circuit found that, as was evident from his own depositions, the plaintiff had received unequivocal, unambiguous notice of termination back on May 2nd and at that time had understood that he would be terminated on December 31st. *Id.* at 289–90.

Here, unlike in *Mull*, Ms. Murrell's employment situation appeared to remain open for reconsideration past March 18, 1997. On May 7, 1997, in fact, Mr. Bowman sent a letter to Mr. Greenwald, stating that "USF & G would like Ms. Murrell to return to work" no later than May 8th. Furthermore, Ms. Murrell continued to be paid for her work as an investigator in USF & G's SID through June 27th, and not for any other "special assignment."

Thus, this Court finds that Ms. Murrell has raised a genuine issue of material fact as to whether she was unambiguously notified of her termination of employment by March 18, 1997.

### B. The Tolling Doctrines

Since this Court has already determined that a genuine issue of material fact exists, it is unnecessary to discuss the tolling doctrines; nonetheless, the Court will briefly address them.

The Seventh Circuit has held that the tolling doctrines of Equitable Estoppel and Equitable Tolling may be applied in discrimination cases to stop the statute of limitations from running, even if the accrual date has passed. *Cada*, 920 F.2d at 450–452; *Mull v. ARCO Durethene Plastics, Inc.*, 784 F.2d 284, 291–292 (7th Cir. 1986). Ms. Murrell claims that either tolling doctrine may be applicable in this case. (Pl.'s Mem. Opp. at 8–10.)

---

---

### 1. The Equitable Estoppel Doctrine

■ The Equitable Estoppel Doctrine applies when the employer "takes active steps to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations." *Cada*, 920 F.2d at 450–451; *Mull*, 784 F.2d at 292. To postpone the date of accrual under the Equitable Estoppel Doctrine, the plaintiff must show that the defendant attempted to mislead him or her. *Cada*, 920 F.2d at 452. The Equitable Estoppel Doctrine does not apply in this case, because there is no evidence in the record to show that USF & G "took active steps" to prevent Ms. Murrell from suing on time.

### 2. The Equitable Tolling Doctrine

■ The Equitable Tolling Doctrine applies "if despite all due diligence [the employee] is unable to obtain vital information bearing on the existence of his claim." *Cada*, 920 F.2d at 451, 452; *Mull*, 784 F.2d at 291. To postpone the date of accrual under the Equitable Tolling Doctrine, the plaintiff must show that he "could not by the exercise of reasonable diligence have discovered essential information bearing on his claim." *Cada*, 920 F.2d at 452. The Equitable Tolling Doctrine does not apply in this case, because there is no evidence in the record to show that Ms. Murrell had any problems discovering essential information related to her claim.

### *CONCLUSION*

Ms. Murrell has raised a genuine issue of material fact, as to whether the last alleged discriminatory act occurred on or after March 18, 1997 and, therefore, whether her EEOC charge was time-barred. Thus, because a genuine issue of material fact exists, Defendants USF & G and Netmax are not entitled to judgment as a matter of law.

**IT IS THEREFORE ORDERED** that:

Defendants' Motion for Summary Judgment be, and the same hereby is, **DENIED.**